1
2
3
4
5
6
7

### UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAMILY FARM ALLIANCE,<br><br>               **Plaintiff,**<br><br>KENNETH LEE SALAZAR, as Secretary of the United States Department of the Interior, *et al.,*<br><br>               **Defendants.** | 1:09-cv-01201 OWW DLB<br><br>MEMORANDUM DECISION RE CROSS MOTIONS FOR SUMMARY JUDGMENT ON CLAIMS TWO AND THREE (DOCS. 54 & 60) |

### I. INTRODUCTION

Before the Court for decision are cross motions for summary judgment on two of Plaintiff's, Family Farm Alliance's ("FFA"), three claims.[1]  The Second Claim alleges that Defendant, Kenneth Salazar, Secretary of the United States Department of the Interior, through the United States Fish and Wildlife Service ("FWS") failed to timely respond to FFA's appeal filed under the Information Quality Act ("IQA"), Pub. L. No. 106-554, § 515(a) (2000), 44 U.S.C. § 3516, and Guidelines issued by the Office of Management and Budget ("OMB") and FWS to

---

[1] The First Claim for Relief has been consolidated with the claims in the *Delta Smelt Consolidated Cases*, 1:09-cv-00407.  Cross motions on all consolidated claims in the *Delta Smelt* cases have been separately submitted for decision.

implement the IQA.  That appeal disputed FWS's IQA compliance in connection with FWS's issuance of a 2008 Biological Opinion under the Endangered Species Act ("ESA"), addressing the impact of the coordinated operations of the federal Central Valley Project ("CVP") and State Water Project ("SWP") on the threatened Delta smelt (*hypomesus transpacificus*) ("2008 Smelt BiOp"). The Third Claim alleges that the peer review FWS commissioned to review the 2008 Smelt BiOp violated National Academy of Sciences ("NAS") standards governing peer reviewer conflicts of interest, incorporated by reference into FWS's IQA Guidelines.

FFA moves for summary judgment, arguing: (1) its IQA claims are judicially reviewable; (2) it has standing to maintain these claims in federal court; and (3) it is entitled to judgment on the merits of its Second and Third claims.  Doc. 54.  Federal Defendants filed a combined cross motion/opposition, arguing: (1) Plaintiff lacks standing; (2) there is no right to judicial review of Plaintiff's IQA claims; (3) the Second Claim is moot because FWS responded to FFA's appeal; and, in the alternative, (4) Federal Defendants are entitled to summary judgment on the merits.  Doc. 61.  FFA filed a combined reply/opposition.  Doc. 67.  Federal Defendants

2

replied.  Doc. 68.

## II. <u>FACTUAL BACKGROUND</u>

On December 14, 2008, FFA submitted to FWS a "Request for Correction" of information in the draft effects analysis of the 2008 Smelt BiOp ("Request"), which asserted that the 2008 Smelt BiOp did not comply with the IQA and the ESA and requested that the 2008 Smelt BiOp be withdrawn and corrected under the IQA.  The Request contained twenty-five specific demands, including but not limited to primary requests that: (1) assumptions contained in the analysis regarding the decline in Delta smelt be replaced with actual data and analysis supporting those assumptions; (2) all statements, assumptions, and assertions which are not supported by the best available scientific data and/or are contradicted by data and analysis be removed and replaced with statements that are supported by the best available scientific data and analysis; (3) all statements which are predicated on speculation, hypothesis, or supposition, rather than data, be removed; (4) the degree of uncertainty regarding the cause of the decline of delta smelt be fully disclosed; (5) well-supported data and analysis which demonstrates that water project pumping operations have no important effects on abundance

3

of delta smelt be acknowledged; and (6) the 2008 Smelt
BiOp be appropriately peer reviewed.  *See* Request, AR
200001-200018.

On December 23, 2008, FWS sent FFA an interim
response, acknowledging receipt of the Request on
December 15, 2008.  AR 800195.  On March 12, 2009,
seventy-nine days after FWS confirmed receipt of the
Request for Correction, FWS transmitted its formal
Response to the FFA.  AR 200019.  The Response stated
that no correction was needed as to any of FFA's
requests.  AR 200019.

On April 1, 2009, FFA appealed FWS's denial of its
Request (the "Appeal") pursuant to FWS IQA Guidelines,
alleging deficiencies in FWS's Response.  On April 27,
2009, FWS sent an interim response letter to FFA,
acknowledging receipt of the Appeal on April 1, 2009 and
advising that, although the IQA Guidelines provide that
the Acting Director has sixty days to respond to an
Appeal, due to the "series of complex scientific and
legal issues" raised in the Appeal, the final
determination may not be completed within that time.  AR
800361.

On May 18, 2009, FFA sent correspondence to FWS
regarding the discovery by another organization that FWS

4

did not possess certain data sets on which it relied in preparing the 2008 Biological Opinion.  AR 800364.  On June 8, 2009, FWS responded, indicating that the agency viewed FFA's May 18, 2009 correspondence as a supplemental request for correction, which is not provided for under the IQA, and would treat it as a revised appeal (which also is not provided for under the IQA), extending the FWS's time to decide FFA's Appeal by another 60 days.  AR 800371.  On June 11, 2009, FFA responded, disputing the FWS's classification of the May 18, 2009 letter as a revised appeal and offering to withdraw the letter.  AR 800373.

    FFA filed this lawsuit on July 10, 2009, claiming FWS:

        (1) Failed to comply with the IQA, the IQA
        Guidelines, and the ESA in promulgating the 2008
        Biological Opinion;

        (2) Was unreasonably delaying responding to
        FFA's IQA Appeal; and

        (3) Failed to conduct an adequate peer review of
        the 2008 Smelt BiOp, because the peer reviewers
        engaged by FWS to review the Biological Opinion
        did not meet NAS standards for independence.

Doc. 1.

1    On November 20, 2009, FWS sent FFA a document

2  entitled:  "U.S. Fish and Wildlife Service's Response to

3  the Family Farm Alliance Information Quality Act (IQA)

4  Appeal of the Draft Effects Analysis of the Biological

5  Opinion on the Continued Long-Term Operations of the

6  Central Valley Project (CVP) and the State Water Project

7  (SWP) April 1, 2009" ("Appeal Response").  AR 800460.

8  The Appeal Response contains a report entitled

9  "Independent Expert Panel Review of the Family Farm

10 Alliance's Information Quality Act Request for

11 Corrections" ("Panel Review"), conducted by Post,

12 Buckley, Shuh & Jernigan ("PBS&J").[2]  On March 16, 2010,

13 Deputy Secretary of the Interior, David J, Hayes, sent a

14 letter to FFA, stating Mr. Hayes's belief that FWS "fully

15 complied" with the IQA.  *See* Declaration of Brenda W.

16 Davis, Doc. 54-2, Exhibit B.

17    In response, FFA sent Mr. Hayes a letter alleging

18 that the Appeal Response was deficient and not in

19 compliance with the IQA.  *Id.*, Exhibits A and C.  Among

20 other things, FFA asserted that the Appeal Response did

21 not respond to the actual requests contained in the

22 Request for Correction and Appeal, and instead

23 summarizes, repurposes, and essentially rewrites FFA's

---

[2] This is not the peer review challenged in the Third Claim.

requests.  *See id.* Exhibit A; *see also* Request for Correction, AR 200001-200018.

### III. <u>LEGAL FRAMEWORK</u>

A.    <u>Summary Judgment.</u>

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is an appropriate mechanism for resolving challenges to final agency action.  *See Occidental Eng' Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).

B.    <u>Information Quality Act.</u>

The IQA provides in its entirety:

(a) IN GENERAL.--The Director of the Office of Management and Budget shall, by not later than September 30, 2001, and with public and Federal agency involvement, issue guidelines under sections 3504(d)(1) and 3516 of title 44, United States Code, that provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of chapter 35 of title 44, United States Code, commonly referred to as the Paperwork Reduction Act.

(b) CONTENT OF GUIDELINES.--The guidelines under subsection (a) shall--

(1) apply to the sharing by Federal agencies

7

of, and access to, information disseminated by Federal agencies; and

(2) require that each Federal agency to which the guidelines apply--

(A) issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a);

(B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a); and

(C) report periodically to the Director--

(i) the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency; and

(ii) how such complaints were handled by the agency.

Pub. L. 106-554, 114 Stat 2763, 2763A-153-2763A-154 (2000)(codified at 44 U.S.C. § 3516).  The IQA has no legislative history.

Subsection (a) mandates that the Office of Management and Budget ("OMB") issue, by no later than September 30, 2001, government-wide guidelines to ensure the "quality,

1   objectivity, utility, and integrity of information"

2   disseminated by federal agencies. *See* Pub. L. No. 106-

3   554, § 515(a) (2000).  The statute itself contains no

4   substantive provisions regarding information quality,

5   leaving the structure and design of any such requirements

6   to OMB.  Nor is there any relevant legislative history

7   disclosing substantive Congressional intent regarding

8   information quality.

9

10       Within one year of OMB's issuance of Guidelines, each

11  federal agency was required to issue its own guidelines

12  consistent with OMB's.  *Id*. at § 515(b)(2)(A).  OMB, the

13  Department of the Interior, and FWS timely issued the

14  required guidelines.  *See, e.g.*, Guidelines for Ensuring

15  and Maximizing the Quality, Objectivity, Utility, and

16  Integrity of Information Disseminated by Federal

17  Agencies, 67 Fed. Reg. 8,452 (Feb. 22, 2002) ("OMB IQA

18  Guidelines"); Information Quality Guidelines of the U.S.

19  Department of the Interior, 67 Fed. Reg. 50,687 (Aug. 5,

20  2002)) ("DOI IQA Guidelines"); FWS Information Quality

21  Guidelines ("FWS IQA Guidelines")[3].  The IQA specifically

22  required agencies to "establish <u>administrative mechanisms</u>

23  allowing affected persons to seek and obtain correction

24  of information maintained and disseminated by the

25

26

27  _____

28       [3] Available at http://www.fws.gov/informationquality/topics/
    IQAguidelines-final82307.pdf (last visited August 11, 2010).

9

agency....” and to “report periodically” on “the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency” and “how such complaints were handled by the agency.” *Id.* at § 515(b)(2)(B)&(C)(emphasis added).

FWS’s own IQA Guidelines are specific to its activities and disseminations, including biological opinions, and state that in order to ensure objectivity of information disseminated, the information will be presented in an “accurate[],” “clear[],” “complete[],” and “unbiased” manner.  FWS IQA Guidelines III-8.  In addition, FWS’ IQA Guidelines require that a “preparer of a highly influential assessment or of influential information ... document the strengths and weaknesses of the data underlying the assessment/information so that the reader will understand the context for the FWS decision.”  FWS IQA Guidelines § VI-10.

## IV. <u>ANALYSIS</u>

A.   <u>Threshold Issues.</u>

Federal Defendants argue that Plaintiff’s claims fail for the following threshold reasons:

(1) Plaintiff’s Second Cause of Action is Moot;

(2) There is no right to judicial review of either IQA claim at issue in this motion; and/or

10

1          (3) Plaintiff has not established standing to

2          sue.

3

4     1.  <u>Second Claim for Relief is Moot.</u>

5          An issue is moot "when the issues presented are no

6     longer 'live' or the parties lack a legally cognizable

7     interest in the outcome." *City of Erie v. Pap's A.M.*,

8     529 U.S. 277, 287 (2000).  If the parties cannot obtain

9     any effective relief, any opinion about the legality of a

10    challenged action is advisory.  *Id.*  "Mootness has been

11    described as the doctrine of standing set in a time

12    frame: The requisite personal interest that must exist at

13    the commencement of the litigation (standing) must

14    continue throughout its existence (mootness)." *Arizonans

15    for Official English v. Arizona*, 520 U.S. 43, 68 n.22

16    (1997) (citation and quotation omitted).  "[A]n actual

17    controversy must be extant at all stages of review, not

18    merely at the time the complaint is filed." *Id.* at 67.

19         Here, Plaintiff's Second Claim for Relief alleges

20    that FWS's failure to timely respond to FFA's appeal

21    violated the IQA Guidelines' timeline for responding to

22    such appeals and that this constitutes an "unlawful

23    delay" under the Administrative Procedure Act ("APA"),

24    which authorizes a reviewing court to "compel agency

25    action unlawfully withheld or unreasonably delayed."  5

11

U.S.C. § 706(1).  It is undisputed that FWS responded to
FFA's appeal on November 20, 2009.  The only relief a
court may order in an unlawful delay claim is to compel
the agency to act.  There is no longer any relief
available to Plaintiff in connection with this claim.
*See Carter v. Veterans Admin.*, 780 F.2d 1479, 1481 (9th
Cir. 1986).

    Plaintiff rejoins that the November 20, 2009 response
is insufficient to moot the Second Claim for Relief
because FWS "failed to actually respond to [FFA's]
Request for Correction and the subsequent IQA Appeal."
Doc. 67 at 17.  Specifically, Plaintiff complains that
FWS "ignored the questions in the Request for Correction,
repurposed some of the issues raised in that petition
into general concepts, and provided generic summaries in
response to the FWS's own inquiries; all of which avoided
responding to the fundamental requests posed by [FFA]."
*Id.*  This is a challenge to the merits, substance, and
sufficiency of FWS's response that goes beyond the
allegation of agency delay on which the Second Claim is
premised.  A merits challenge to the Appeal Response has
not been raised in the Complaint; FFA has not moved for
leave to amend its Complaint; and the Complaint cannot be
amended to avoid summary judgment because of the

additional jurisdictional defects discussed below.

Plaintiffs' argument that the controversy is ongoing (and therefore not moot) because the 2008 Smelt BiOp has not been withdrawn from the public domain is unavailing. The Second Claim for Relief specifically challenges the _timing_ of FWS's failure to respond to FFA's IQA Appeal. FWS responded.  Any controversy over the timing of FWS's response is moot.  _Carter,_ 780 F.2d at 1481 (where only relief is to compel action which has been taken, no further relief can be provided).  This claim fails as a matter of law.

2.  <u>Right to Judicial Review Under the Administrative Procedure Act.</u>

It is undisputed that the IQA provides no private right of action.[4]  A party challenging an administrative agency's compliance with a substantive statute that lacks an internal private right of action must seek judicial

---

[4] Plaintiff is correct that the lack of "rights-creating" language in the IQA is not fatal to its claims, but FFA misunderstands the reason why the absence of such language is not dispositive.  Plaintiff discusses at great length the example of the National Environmental Policy Act ("NEPA"), arguing NEPA is a procedural statute similar to the IQA for which judicial review <u>is</u> provided.  Judicial review of NEPA cases is afforded <u>under the APA</u>, so long as the threshold jurisdictional requirements of the APA are satisfied.  Whether those threshold requirements are satisfied with respect to the IQA claims in this case is a separate question that is not resolved by virtue of the fact that NEPA cases are reviewable under the APA.  While NEPA and the IQA may both be procedural statutes, their provisions are far from identical.  NEPA contains specific statutory commands that federal agencies prepare environmental impact statements ("EIS") before undertaking "major Federal actions significantly affecting the human environment." Mandatory information must be included in every EIS as defined by statute.  The IQA contains no such specific requirements.

1    review under the APA.  *See Lujan v. Nat'l Wildlife Fed'n*,

2    497 U.S. 871, 882 (1990); *Village of False Pass v. Clark*,

3    733 F.2d 605, 609 (9th Cir. 1984) (because ESA contains

4    no internal standard of review, APA § 706 governs review

5    of actions brought under the ESA).

6        The APA authorizes suit by a plaintiff "suffering

7    legal wrong because of agency action, or adversely

8    affected or aggrieved by agency action within the meaning

9    of a relevant statute."  5 U.S.C. § 702.  There is a

10   presumption of reviewability under the APA.  *Shalala v.*

11   *Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 44

12   n.11 (2000).  However, the APA <u>expressly precludes</u>

13   judicial review where: (1) any statute "precludes

14   judicial review"; or (2) "agency action is committed to

15   agency discretion by law."  5 U.S.C. § 701(a).  If either

16   of these exceptions is triggered, the lawsuit cannot

17   proceed under the APA.

18       If neither of these exceptions applies, the APA

19   permits judicial review of "[a]gency action made

20   reviewable by statute and <u>final agency action</u> for which

21   there is no other adequate remedy in a court...."  5

22   U.S.C. § 704.  Where a statute lacks an internal judicial

23   review provision, the "agency action made reviewable by

24   statute" language is inapplicable, requiring the

**14**

existence of a "final agency action."  "Agency action" is
defined to include "the whole or a part of an agency
rule, order, license, sanction, relief, or the equivalent
or denial thereof, or failure to act."  5 U.S.C. §
551(13).  The APA requires that the agency action be
upheld unless it is found to be "arbitrary, capricious,
an abuse of discretion, or otherwise not in accordance
with law," or "without observance of procedure required
by law."  5 U.S.C. § 706(2).  The Third Claim for Relief
for failure to conduct an appropriate peer review of the
2008 Biological Opinion invokes § 706(2) by alleging that
the peer review was conducted "without observance of
procedure required by law."

      a.   **APA § 702(a)(2)'s Exception for Agency
Action "Committed to Agency Discretion by
Law" Bars Judicial Review in this Case.**

Plaintiff does not allege that any statute expressly
precludes judicial review of Plaintiff's IQA claim.  The
issue is whether the IQA and/or its implementing
guidelines, by law, commit to agency discretion the
disputed agency actions challenged by Plaintiff's claims.

The general test for when an action is "committed to
agency discretion by law" under the APA is whether there
is "no law to apply."  *Heckler v. Chaney*, 470 U.S. 821,
830 (1985) (internal quotation marks omitted).  "Agency

action is committed to the discretion of the agency by law when 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler*, 470 U.S. at 830).  "If no 'judicially manageable standard' exists by which to judge the agency's action, meaningful judicial review is impossible and the courts are without jurisdiction to review that action." *Id*.  Here, the IQA itself contains <u>absolutely no substantive standards</u>, let alone any standards relevant to the claims brought in this case concerning the timing of responses to Requests and Appeals and the makeup of peer review panels.  The statute itself commits the challenged agency actions to the agency's discretion.  However, even "[w]here an action is committed to absolute agency discretion by law, ... courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations." *United States v. Carpenter*, 526 F.3d 1237, 1242 (9th Cir. 2008); *see also Padula v. Webster*, 822 F.2d, 97, 100 (9th Cir. 1987)("Judicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes, but if

16

a court examines all these possible sources and concludes that there is, in fact, 'no law to apply,' judicial review will be precluded.")(quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). The critical issue is: Do the agency's own regulations create meaningful standards or do they preserve the discretion afforded by the statute?

*Salt Institute v. Thompson*, 345 F. Supp. 2d 589 (E.D. Va. 2004), aff'd sub nom. on alternate grounds, *Salt Inst. v. Leavitt*, 440 F.3d 156 (4th Cir. 2006), applied 701(a)(2) and *Steenholdt* to the IQA, finding that "[n]either the IQA nor the OMB Guidelines provide judicially manageable standards that would allow meaningful judicial review to determine whether an agency properly exercised its discretion in deciding a request to correct a prior communication." With respect to the request for correction at issue in *Salt Institute*:

> [T]he guidelines provide that "[a]gencies, in making their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved." 67 Fed. Reg. at 8458. Courts have determined that regulations containing similar language granted sufficient discretion to agencies to preclude judicial review under the APA. *See Steenholdt*, 314 F.3d at 638 (holding that agency's decision under a regulation allowing an agency to take an action "for any

17

reason the Administration considers appropriate"
is committed to agency discretion and not
reviewable under APA). Judicial review of [the
agency's] discretionary decisions is not
available under the APA because the IQA and OMB
guidelines at issue insulate the agency's
determinations of when correction of information
contained in informal agency statements is
warranted.

*Id.* at 602-603.  Do the IQA Guidelines create meaningful

standards over the timing of responses and/or the makeup

of a peer review panel, or do the Guidelines preserve

agency discretion over these procedural matters?

(1) <u>Application to the Second Claim for
Relief.</u>

The Second Claim alleges that FWS failed "to timely

respond to [FFA's] appeal and/or make corrections to the

2008 Biological Opinion."  Doc. 1 at 16-17.  Neither the

IQA itself nor the OMB Guidelines contain any relevant

deadlines.  The timing provisions FFA alleges were

violated are contained in FWS's own IQA Guidelines.  The

FWS IQA Guidelines provide a process for: (1) an initial

"Request for Correction of Information"; and (2) an

administrative appeal, or "Information Quality Appeal."

For an initial petition, the FWS IQA Guidelines state:

"FWS will review the request and issue a decision within

90 calendar days from the receipt of the challenge."  FWS

IQA Guidelines, Part V-6.  "If the request requires more

than 90 calendar days to resolve, the agency will inform

18

the requester that more time is required, indicating the

reason(s) why and providing an alternative timeline for

reaching a decision." FWS IQA Guidelines, Part V-6. If

the initial request is denied by FWS or if the requester

is "dissatisfied with a FWS decision regarding their

request," the FWS IQA Guidelines provide for an

administrative appeal, and the "Director of the FWS or

his/her designated representative will make the final

decision on the appeal within 60 calendar days from

receipt of the appeal in the FWS." FWS IQA Guidelines,

Part V-8.

Notwithstanding the time period for responding to an

appeal contained in Part V-8, the Guidelines state that

alternative procedures may be utilized:

> The quality of the information that the FWS
> disseminates is always important, however,
> factors such as homeland security, threats to
> public health, statutory or court-ordered
> deadlines, <u>circumstances beyond our control, or
> other unforeseen events</u> may limit applicability
> of these guidelines. <u>The application of these
> factors will be determined by the Director, FWS
> or his/her designee which may result in a
> deferral, waiver, or use of alternative
> procedures</u>.

FWS IQA Guidelines Part II (emphasis added). Like the

guidelines pertaining to the decision whether or not to

correct information at issue in *Salt Institute*, which

were completely discretionary because the agency could

19

"mak[e] their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved," 67 Fed. Reg. at 8458, so too Part II of the FWS IQA Guidelines consigns all matters related to application of those Guidelines, including the timing of responses, to the discretion of FWS.  The FWS Guidelines prescribe a timeline for responding to Requests for Correction and Appeals, but authorize the Director or his designee to depart from the Guidelines under a wide range of circumstances, including "circumstances beyond our control or other unforeseen events."  Section 701(a)(2) bars judicial review of the Second Claim for Relief because neither the IQA nor the OMB Guidelines contain substantive standards with respect to response deadlines, and FWS's own Guidelines preserve the agency's discretion with respect to its deadlines.

> (2) <u>Application to the Third Claim for Relief.</u>

The Third Claim for Relief alleges that FWS failed to conduct an appropriate peer review of the 2008 Biological Opinion.  Specifically, FFA alleges that certain members of the peer review body were not sufficiently independent

20

because they authored papers upon which portions of the 2008 Smelt BiOp were based, were graduate students of persons whose work formed the basis of portions of the 2008 Smelt BiOp, were CALFED (a joint federal state initiative concerning the Delta) grant recipients, and/or participated in working groups whose work product was considered by the authors of the 2008 Smelt BiOp.  Doc. 1 at ¶60.[5]

The OMB IQA Guidelines define "quality," "utility," "objectivity," and "integrity."[6]  Only the "objectivity" definition contains guidance about peer review:

> "Objectivity" involves two distinct elements, presentation and substance.
>
> a. "Objectivity" includes whether disseminated information is being presented in an accurate, clear, complete, and unbiased manner. This involves whether the information is presented within a proper context. Sometimes, in disseminating certain types of information to the public, other information must also be disseminated in order to ensure an accurate, clear, complete, and unbiased presentation. Also, the agency needs to identify the sources of the disseminated information (to the extent possible, consistent with confidentiality protections) and, in a scientific, financial, or statistical context, the

---

[5] At oral argument, FFA mentioned a number of other complaints about the peer review process, none of which were raised in the Complaint.

[6] Plaintiff cites these definitions as examples of judicially enforceable standards.  Even assuming these are enforceable standards, they do not address the deadline issues raised by the Second Cause of Action and are therefore not discussed in connection with that claim.

supporting data and models, so that the
public can assess for itself whether there
may be some reason to question the
objectivity of the sources. Where
appropriate, data should have full,
accurate, transparent documentation, and
error sources affecting data quality should
be identified and disclosed to users.

b. In addition, "objectivity" involves a
focus on ensuring accurate, reliable, and
unbiased information. In a scientific,
financial, or statistical context, the
original and supporting data shall be
generated, and the analytic results shall be
developed, using sound statistical and
research methods.

i. If data and analytic results have
been subjected to formal, independent,
external peer review, the information
may generally be presumed to be of
acceptable objectivity. However, this
presumption is rebuttable based on a
persuasive showing by the petitioner in
a particular instance. If agency-
sponsored peer review is employed to
help satisfy the objectivity standard,
the review process employed shall meet
the general criteria for competent and
credible peer review recommended by
OMB-OIRA to the President's Management
Council (9/20/01)... namely, "that (a)
peer reviewers be selected primarily on
the basis of necessary technical
expertise, (b) peer reviewers be
expected to disclose to agencies prior
technical/policy positions they may
have taken on the issues at hand, (c)
peer reviewers be expected to disclose
to agencies their sources of personal
and institutional funding (private or
public sector), and (d) peer reviews be
conducted in an open and rigorous
manner."

67 Fed. Reg. 8,459-60.  This provides, generally, that

peer review is one, but not the only, way to satisfy the objectivity requirement.  Where peer review is employed, it "shall meet the general criteria for competent and credible peer review recommended by OMB-OIRA to the President's Management Council (9/20/01)...."  The OMB-OIRA criteria are not expressed as enforceable standards. Rather, they prescribe that (a) peer reviewers be selected "primarily" on the basis of necessary technical expertise; (b) peer reviewers are expected to "disclose" prior technical/policy positions taken on the issues at hand, and (c) their sources of personal and institutional funding (private or public); and (d) peer reviews are to be conducted in an "open and rigorous manner."  *Id.*

These criteria are not disabling as they do not call for disqualification, even where potential sources of conflict exist.  The OMB-OIRA criteria only require <u>disclosure</u> to the agency of prior technical or policy positions taken on the issues under review and/or reviewers' sources of personal and institutional funding. The OMB-OIRA criteria do not create enforceable rules of conduct.  Nothing in the statute or the Guidelines address the use of peer reviewers with the potential sources of conflict about which FFA complains.

FFA references the FWS IQA Guidelines at Part VI-2,

which state that "FWS adheres to the OMB Memorandum (M-05-030) 'Final Information Quality Bulletin for Peer Review' dated December 16, 2004, to ensure that influential scientific information disseminated to the public is subject to peer review."  For influential scientific information, the OMB IQA Bulletin for Peer Review "requires agencies to <u>adopt or adapt</u> the committee selection policies employed by the National Academy of Sciences (NAS) when selecting peer reviewers who are not government employees."  *See* Doc. 61 at Ex. A (OMB Information Quality Bulletin for Peer Review) at 3.[7]  The NAS Policy referenced in the OMB IQA Bulletin is entitled "Policy on Committee Composition and Balance and Conflict of Interest"[8] and contains guidance on the subject of conflicts of interest.  Although the OMB IQA Bulletin for Peer Review requires each federal agency adopt or adapt the NAS Policy when disseminating influential scientific information, in a separate section entitled "Judicial Review," the Bulletin <u>specifically disclaims creating any right to judicial review</u>:

> This Bulletin is intended to improve the internal management of the executive branch, and is not intended to, and <u>does not, create any right or benefit, substantive or procedural,</u>

---

[7] The OMB IQA Bulletin for Peer Review was published in the Federal Register.  70 Fed. Reg. 2,664 (Jan. 14, 2005).

[8] *See* Doc. 61-2, Ex. B, available at http://www.nationalacademies.org/coi/index.html.

>            <u>enforceable at law or in equity</u>, against the
>            United States, its agencies or other entities,
>            its officers or employees, or any other person.

OMB IQA Bulletin for Peer Review at Part XII, p. 41

(emphasis added).

    *Salt Institute* held: "Judicial review of [the

agency's] discretionary decisions is not available under

the APA because the IQA and OMB guidelines at issue

insulate the agency's determinations of when correction

of information contained in informal agency statements is

warranted."  345 F. Supp. 2d at 603.  Likewise, the OMB

IQA Bulletin insulates from judicial review the agency's

determinations about peer reviewers.

    The IQA itself contains no standards concerning peer

review, committing such matters to agency discretion.

The OMB IQA Bulletin for Peer Review specifically

disclaims that its contents create any enforceable

rights, thereby preserving the agency's discretion to

interpret and apply the OMB IQA Bulletin for Peer Review.

There is "no law to apply" to Plaintiff's claim regarding

the makeup of the peer review panel.  Section 701(a)(2)

bars judicial review of the Third Claim.

        b.   <u>Plaintiff's Arguments That *Salt Institute*
           and Other Cases Cited by Defendants Are
           Distinguishable.</u>

    Plaintiff seeks to distinguish *Salt Institute* on that

ground that, there, plaintiff sought to <u>obtain</u>

information from the Department of Health and Human

Services under the IQA, not to <u>correct</u> allegedly

erroneous information disseminated by that agency.  Doc.

67 at 13.  The *Salt Institute* plaintiffs alleged that the

defendant agency, the National Heart, Lung and Blood

Institute ("NHLBI"), violated the IQA by (1) failing to

disclose certain data and methods used by a grant

recipient, (2) reporting the results of that study on the

NHLBI website and in medical journals, and (3)

recommending that people limit their sodium intake.  *Salt*

*Institute v. Thompson,* 345 F. Supp. 2d at 592-93.  The

second and third claims in *Salt Institute* were requests

to correct erroneous information, not only requests for

information.  The Fourth Circuit affirmed dismissal of

the claims for lack of standing, reasoning:

> By its terms, [the IQA] statute creates no legal
> rights in any third parties.  Instead, it orders
> the Office of Management and Budget to draft
> guidelines concerning information quality and
> specifies what those guidelines should contain.
> Because the statute upon which appellants rely
> does not create a legal right to access to
> information <u>or to correctness</u>, appellants have
> not alleged an invasion of a legal right and,
> thus, have failed to establish an injury in fact
> sufficient to satisfy Article III.

*Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006).

Federal Defendants cite a number of other cases in

which courts have refused to exercise jurisdiction over IQA claims.  *See In re Operation of the Missouri River Sys. Litig.*, 363 F. Supp. 2d 1145, 1174 (D. Minn. 2004)[9] ("[T]he language of the IQA indicates that the Court may not review an agency's decision to deny a party's information quality complaint.  The IQA does not provide for a private cause of action...."), aff'd in part and vacated in part on other grounds, 421 F.3d 618 (8th Cir. 2005); *Haas v. Gutierrez*, 2008 WL 2566634, *6 (S.D.N.Y. June 26, 2008) (same); *Americans for Safe Access v. U.S. Dep't of Health & Human Servs.*, 2007 WL 2141289, *4 (N.D. Cal. July 24, 2007), aff'd 2010 WL 4024989 (Oct. 14, 2010)(same).

Plaintiff argues that *Salt Institute* and these other cases are distinguishable on the ground none of them involved "final agency action" cognizable under the APA. The issuance of the 2008 Smelt BiOp is indisputably final agency action under the APA.  However, whether or not Plaintiff challenges final agency action is irrelevant to the applicability of APA § 701(a)(2), which operates as a threshold bar to operation of the APA in this IQA case,

_____

[9] At oral argument, Plaintiff attempted to distinguish *Missouri River* on the ground that the IQA was a "peripheral" issue in that case.  Peripheral or not, the *Missouri River* decision directly addressed whether agency action under the IQA was committed to agency discretion by law barring judicial review under 5 U.S.C. § 701(a)(2).

27

1    regardless of the presence of "final agency action."

2

3            c.   ***Prime Time Int'l Co. v. Vilsack*, 599 F.3d
                  678 (D.C. Cir. 2010) Does Not Support
4                 Assertion of Judicial Review in this Case.**

5        Plaintiff places great emphasis on the D.C Circuit's

6    recent decision in *Prime Time Int'l Co. v. Vilsack*, 599

7    F.3d 678 (D.C. Cir. 2010), to argue that the DC Circuit

8    has decided the IQA is judicially reviewable.  The

9    district court, in *Single Stick, Inc. v. Johanns*, 601 F.

10   Supp. 2d 307, 316 (D.D.C. 2009), found that plaintiff did

11   not have standing to pursue its claims that USDA violated

12   the IQA by failing to correct or disclose data sources

13   underlying its market share calculations and by failing

14   to respond to plaintiff's petition and request for

15   reconsideration:

16

17            To allow a plaintiff to seek review of an
              agency's violation of a statute, the court must
18            examine "whether or not Congress intended to
              confer individual rights upon a class of
19            beneficiaries" in enacting the statute. *Gonzaga
              Univ. v. Doe*, 536 U.S. 273, 285 (2002). "The
20            question is not simply who would benefit from
              the Act, but whether Congress intended to confer
21            federal rights upon those beneficiaries."
              *California v. Sierra Club*, 451 U.S. 287, 294
22            (1981). To make this determination, a court
              should focus on whether the statute contains
23            "rights-creating language," *see Gonzaga Univ.*,
              536 U.S. at 287, which is language that
24            emphasizes the individuals protected rather than
              simply dictating the actions an agency should
25            take. *See Alexander v. Sandoval*, 532 U.S. 275,
              289 (2001)  (holding that "[s]tatutes that focus
26            on the person regulated rather than the
              individuals protected create 'no implication of
27

28
                              28

an intent to confer rights on a particular class of persons' " (quoting *Sierra Club*, 451 U.S. at 294)).

The IQA "<u>creates no legal rights in any third party,</u>" and "<u>does not create a legal right to access to information or to correctness.</u>" *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir.2006). Both the actual text of the statute and its implementing guidelines dictate the actions that agencies must take and do not contain "individually focused terminology." *Gonzaga Univ.*, 536 U.S. at 287; *see* 44 U.S.C. § 3516 note ("The Director [of the Office of Management and Budget ("OMB")] shall ... issue guidelines ... that provide policy and procedural guidance to Federal agencies ..."); *see also* Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies, 67 Fed. Reg. 8452, 8458 (Feb. 22, 2002) (republication) (ordering that agencies should "[i]ssue their own information quality guidelines[,] ... [e]stablish administrative mechanisms[, and] ... report to the Director of OMB the number and nature of complaints"). The focus of the IQA is the communication between agencies and the development of internal procedures for ensuring quality of information. While the statute obligates agencies to establish a process by which individuals can alert an agency to a need for information correction to improve information quality, the statute does [not] contain any indication that individuals choosing to participate in such a process have a right to seek or correct information. *See* 67 Fed. Reg. at 8458-59. Because the IQA lacks any rights-creating language, Single Stick has no right under that statute to seek review of the USDA's actions.

*Id.* at 316.

The trial court found that plaintiff's challenge could not proceed under the APA because there was no final agency action:

1
2
3
4
5
6
7
8
9
10
11
12
13
14

> An agency action is reviewable under the APA only if the action is a final agency action. *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 61-62 (2004). A final agency action is one where "'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 178, (1997) (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Because the IQA does not vest any party with a right to information or to correction of information, *see Salt Inst.,* 440 F.3d at 159, the USDA's actions under the IQA did not determine Single Stick's rights or cause any legal consequence. *See Ams. for Safe Access v. HHS*, No. C 07-01049 WHA, 2007 WL 2141289, at *4 (N.D. Cal. July 24, 2007) (holding that because the IQA does not grant any legal rights, there was no legal consequence flowing from the defendant's response to the plaintiff's IQA petition). Accordingly, the USDA's lack of response was not a final agency action and cannot be reviewed under the APA. *See id.*

15    *Id*. at 316-317.

16
17    The D.C. Circuit affirmed dismissal of the IQA claims

18    on an entirely different ground, based on USDA's

19    argument, not raised below, that an exemption from the

20    term "dissemination" used in the OMB guidelines barred

21    plaintiff's claim:

22
23
24

> The Information Quality Act of 2000 provides that the Director of the Office of Management and Budget ("OMB") shall, "with public and Federal agency involvement," issue guidelines by the end of September 2001 that:

25
26
27
28

>> provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the

1          purposes and provisions of chapter 35 of
           title 44, United States Code, commonly
2          referred to as the Paperwork Reduction Act.

3      44 U.S.C. § 3516 note (a). The guidelines "apply
       to the sharing by Federal agencies of, and
4      access to, information disseminated by Federal
       agencies," and require such agencies to "issue
5      guidelines ensuring and maximizing the quality,
       objectivity, utility, and integrity of
6      information ... disseminated by the agency." Id.
       § 3516 note (b)(1), (2)(A). Each such Federal
7      agency shall, under the guidelines, "establish
       administrative mechanisms allowing affected
8      persons to seek and obtain correction of
       information maintained and disseminated by the
9      agency that does not comply with the guidelines
       issued under" the IQA. Id. § 3516 note
10     (b)(2)(B).

11     The OMB Guidelines define "dissemination" as
       "agency initiated or sponsored distribution of
12     information to the public." 67 Fed. Reg. at
       8460. The definition excludes "distribution
13     limited to ... adjudicative processes." Id. On
       appeal, USDA points to the preamble to OMB's
14     Guidelines:

15          The exemption from the definition of
            "dissemination" for "adjudicative processes"
16          is intended to exclude, from the scope of
            these guidelines, the findings and
17          determinations that an agency makes in the
            course of adjudications involving specific
18          parties. There are well-established
            procedural safeguards and rights to address
19          the quality of adjudicatory decisions and to
            provide persons with an opportunity to
20          contest decisions. These guidelines do not
            impose any additional requirements on
21          agencies during adjudicative proceedings and
            do not provide parties to such adjudicative
22          proceedings any additional rights of
            challenge or appeal.

23
       67 Fed. Reg. at 8454. USDA's guidelines, in
24     turn, exclude "documents prepared and released
       in the context of adjudicative processes." USDA
25     Information Quality Guidelines, Definitions, §
       2, supra note 4.

26
       Prime Time sought disclosure and correction
27     under the IQA of the data that USDA used to
       calculate its [] assessments[.]  USDA never
28     responded, and Prime Time challenges that

                           31

1      nonresponse. USDA maintains that the IQA does
       not mandate the issuance of information but
2      merely instructs OMB to "provide policy and
       procedural guidance" for ensuring quality,
3      utility, and integrity of information. 44 U.S.C.
       § 3516 note (a). Prime Time relies, however, on
4      the provision that requires agencies to
       "establish administrative mechanisms allowing
5      affected persons to seek and obtain correction
       of information maintained and disseminated by
6      the agency." *Id.* § (b)(2)(B). Regardless,
       because Congress delegated to OMB authority to
7      develop binding guidelines implementing the IQA,
       we defer to OMB's reasonable construction of the
8      statute. *See United States v. Mead*, 533 U.S.
       218, 226-27 (2001). The IQA is silent on the
9      meaning of "dissemination," and in defining the
       term OMB exercised its discretion to exclude
10     documents prepared and distributed in the
       context of adjudicative proceedings. This is a
11     permissible interpretation of the statute, *see
       Chevron*, 467 U.S. at 843, and *Prime Time* does
12     not contend otherwise. Rather, *Prime Time*
       attempts to avoid the consequences of the IQA
13     exemption for adjudications on the ground it is
       waived because USDA did not raise it in the
14     district court.

15   *Id.* 684-86 (footnotes omitted).

16       The issue of whether the newly raised argument should

17   be addressed was decided affirmatively:

18
         This court has repeatedly recognized that issues
19       and legal theories not asserted in the district
         court "ordinarily will not be heard on appeal."
20       *See, e.g., Horowitz v. Peace Corps*, 428 F.3d
         271, 282 (D.C. Cir. 2005).... The reasons for
21       this rule are clear:

22           [O]ur procedural scheme contemplates that
             parties shall come to issue in the trial
23           forum vested with authority to determine
             questions of fact. This is essential in
24           order that parties may have the opportunity
             to offer all the evidence they believe
25           relevant to the issues which the trial
             tribunal is alone competent to decide; it is
26           equally essential in order that litigants
             may not be surprised on appeal by final
27           decision there of issues upon which they
             have had no opportunity to introduce
28           evidence.

                              **32**

1

2
    *Hormel v. Helvering*, 312 U.S. 552, 556 (1941).

3
    USDA did not raise the "exemption for adjudications" argument in the district court, so normally it would be forfeited. *See generally*

4
    *United States v. Olano*, 507 U.S. 725, 733 (1993). However, in *Singleton v. Wulff*, 428 U.S.

5
    106, 121 (1976), the Supreme Court observed:

6
      The matter of what questions may be taken up and resolved for the first time on appeal is

7
      one left primarily to the discretion of the courts of appeals, to be exercised on the

8
      facts of individual cases. We announce no general rule. <u>Certainly there are</u>

9
      <u>circumstances in which a federal appellate court is justified in resolving an issue not</u>

10
      <u>passed on below, as where the proper resolution is beyond any doubt,</u> *see Turner*

11
      *v. City of Memphis*, 369 U.S. 350 (1962).

12
      <u>The "proper resolution [of the IQA issue] is beyond any doubt," so this court is free to</u>

13
      <u>reach it</u>. The issue involves a straightforward legal question, and both parties have fully

14
      addressed the issue on appeal. Consequently, no "injustice" will be done if we decide the issue.

15
      *Id*.

16
*Prime Time*, 599 F.3d at 686 (emphasis added).

17
  FFA argues that the D.C. Circuit affirmed the

18
dismissal on an issue other than the availability of

19
judicial review under the IQA, which amounts to an

20
implied finding that there is a right to judicial review

21
under the IQA.  To the contrary, the appeals court

22
specifically concluded the underlying agency action --

23
USDA's determination of manufacturer's assessments under

24
the Fair and Equitable Tobacco Reform Act ("FETRA") --

25
was an adjudicatory proceeding subject to judicial review

26

27

28

1    directly under FETRA:[10]

2            USDA's determination of Prime Time's assessments
        for three quarters of FY 2005 was an
3        adjudication, attendant to which Prime Time had
        rights to an administrative appeal and judicial
4        review. *See* 5 U.S.C. § 551(7) (defining
        "adjudication"); 7 U.S.C. § 518d(i), (j). Prime
5        Time's contention that USDA violated the IQA
        when it did not respond to a request to disclose
6        and correct certain information underlying the
        tobacco assessments thus fails.
7
            Accordingly ... we affirm the dismissal of the
8        IQA challenge, although on a different ground
        than relied upon by the district court.
9
10   *Id.* at 686.  There was no need to and that decision did

11   not evaluate whether the IQA provided a basis for

12   judicial review.[11]  *Prime Time* does not

13   support Plaintiff's argument that by negative inference

14   the IQA provides a right to judicial review.[12]

15

16        [10] Neither the issuance of the 2008 Smelt BiOp nor FWS's actions
     with respect to the peer review panel constitute adjudications under
17   the APA, which defines "adjudication" to mean means "agency process
     for the formulation of an order.  5 U.S.C. § 551(7).  An "order" is
18   "the whole or a part of a final disposition, whether affirmative,
     negative, injunctive, or declaratory in form, of an agency in a
19   matter other than rule making but including licensing."  § 551(6).
     The issuance of a biological opinion is, however, reviewable under
20   the APA as "final agency action" subject to judicially manageable
     standards set forth in the ESA.  *California Trout v. F.E.R.C.*, 572
21   F.3d 1003, 1011 n. 4 (9th Cir. 2009).
        [11] The government petitioned for rehearing to seek a specific
22   ruling that the IQA is not judicially reviewable.  The DC Circuit
     issued a single page denial, which did not address judicial
23   reviewability.  *See United States v. Cote*, 51 F.3d 178, 181 (9th
     Cir. 1995) (summary denial of a rehearing petition does not
24   establish that the court considered and decided the issue the
     petition presented).
25        [12] The OMB Guidelines acknowledge "[t]here are well-established
     procedural safeguards and rights to address the quality of
26   adjudicatory decisions and to provide persons with an opportunity to
     contest decisions," and explain that "[t]hese guidelines do not
27   impose any additional requirements on agencies during adjudicative
     proceedings and do not provide parties to such adjudicative
28   proceedings any additional rights of challenge or appeal."  67 Fed.

                                34

3.   **Standing.**

   a.   **Presentation of Competent Evidence.**

   Federal Defendants complain that, at least as of the filing of their reply brief, Plaintiff presented no evidence demonstrating its standing.  FFA erroneously insisted in its own reply/opposition that such facts only need be alleged in its complaint.  *See* Doc. 67 at 5.[13]  On summary judgment, FFA must establish standing to sue by "competent evidence":

> The party invoking federal jurisdiction bears the burden of establishing the[ ] elements [of standing].....  Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, [] on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.  In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted).

   Although two individuals filed standing affidavits on

---

Reg. 8,454.
   [13] Plaintiff also objects that Federal Defendants' did not timely raise the issue of standing.  *See* Doc. 67 at 4-5.  This objection is without merit.  Standing goes to subject matter jurisdiction, the absence of which can be raised "at any time" by a party or the Court.  *See* Fed. R. Civ. P. 12(h)(3).

behalf of FFA in the *Delta Smelt Consolidated Cases* on December 3, 2009, those declarations were <u>not filed in this</u> case until September 7, 2010, several weeks after Plaintiff filed its reply brief in connection with these cross motions. *See* Docs. 69 & 70.  The standing declarants, Joe Del Bosque and Chris Hurd, both claim to members of FFA.  Both are farmers in Fresno County, and claim to have been harmed by the water export restrictions imposed by the 2008 Biological Opinion.  *See id*.

     A court has a *sua sponte* duty to examine standing in every case.  *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002).  Normally, to prevent prejudice from the late filing of these declarations, Defendants should be afforded the opportunity to respond.  However, because Plaintiff's standing declarations are insufficient as a matter of law, further briefing is unnecessary.

          b.   <u>Legal Standard Re: Standing.</u>

     Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III.  *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir. 2001).  "To satisfy the Article III case or controversy requirement, a litigant must have suffered

36

some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1984). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

The doctrine of standing "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984). "The court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas*, 495 U.S., 149 155-56 (9th Cir. 1990); *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 821 (9th Cir. 2002). Standing requires three elements.

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

(1992) (internal citations and quotations omitted).   When

a plaintiff seeks to vindicate a procedural harm, rather

than a substantive right, the causation and

redressibility requirements are relaxed:

> A showing of procedural injury lessens a
> plaintiff's burden on the last two prongs of the
> Article III standing inquiry, causation and
> redressibility. Plaintiffs alleging procedural
> injury must show only that they have a
> procedural right that, if exercised, <u>could</u>
> protect their concrete interests.

*Salmon Spawning & Recovery Alliance v. Gutierrez*, 545

F.3d 1220, 1226 (9th Cir. 2008) (emphasis in original)

(internal citations and quotations omitted).

        Where an organization or association sues on behalf

of its members, that organization or association must

demonstrate that: (1) its members would otherwise have

standing to sue in their own right; (ii) the interests it

seeks to protect are germane to the organization's

purpose; and (iii) neither the claim asserted nor the

relief requested requires the participation of individual

members in the lawsuit.   *Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181

(2000).

        Standing is evaluated on a claim-by-claim basis.   "A

plaintiff must demonstrate standing 'for each claim he

seeks to press' and for 'each form of relief sought.'"

*Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).  "[S]tanding is not dispensed in gross...."  *Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996).

> The actual-injury requirement would hardly serve the purpose ... of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration.

*Id.* at 357.

        c.   <u>Injury-In-Fact.</u>

*Salt Institute v. Leavitt*, 440 F.3d 156, 158-59 (4th Cir. 2006), affirmed the dismissal of two IQA claims -- one alleging that information was withheld in violation of the IQA and another alleging that erroneous information was released in violation of the IQA -- on the ground that the IQA creates no legal right to information or its correctness and therefore that plaintiffs had no standing to sue:

> To invoke the jurisdiction of an Article III court, the plaintiffs "must have suffered an 'injury in fact.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The injury "required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Id.* at 578 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). The injuries alleged by appellants are the deprivation of the raw data from the studies and the asserted incorrectness in NHLBI's public

1    statements.

2    Although there is no general common law right to
     information from agencies or to informational
3    correctness, appellants insist that these rights
     are conferred by the IQA... By its terms, [the
4    IQA] creates no legal rights in any third
     parties. Instead, it orders the Office of
5    Management and Budget to draft guidelines
     concerning information quality and specifies
6    what those guidelines should contain. <u>Because
     the statute upon which appellants rely does not</u>
7    <u>create a legal right to access to information or
     to correctness, appellants have not alleged an</u>
8    <u>invasion of a legal right and, thus, have failed
     to establish an injury in fact sufficient to</u>
9    <u>satisfy Article III</u>.

10   *Id*. at 158-59 (emphasis added)(footnotes omitted).   FFA's

11   contention that assertion of an informational injury is

12   sufficient was specifically rejected:

13

14   Against this conclusion, appellants argue that
     the Supreme Court recognized the sufficiency of
15   informational injuries in *Federal Election
     Commission v. Akins*, 524 U.S. 11 (1998).
16   <u>However, in relying upon *Akins*, appellants
     confuse two distinct standing inquiries: the</u>
17   <u>concreteness of the alleged injury and the
     status of the claimed right</u>. In *Akins*, the
18   Supreme Court held that an informational injury
     was "sufficiently concrete and specific" to
19   satisfy Article III. *Id*. at 25. <u>In this case, we
     have not decided (and need not decide) the</u>
20   <u>question whether appellants' alleged injury is
     sufficiently concrete and specific. Rather, we</u>
21   <u>have decided the antecedent question whether
     Congress has granted a legal right to the</u>
22   <u>information in question. *Akins* controls the
     former question, but not the latter. Indeed, on</u>
23   <u>the latter question, *Akins* is distinguishable
     because the statute in question there, the</u>
24   <u>Federal Election Campaign Act of 1971, clearly
     created a right to information by requiring the</u>
25   <u>Federal Election Commission to make certain
     information available to the public. See 2</u>
26   <u>U.S.C. § 434(a)(11)(B) ("The Commission shall
     make a designation, statement, report, or</u>
27   notification that is filed with the Commission
     under this Act available for inspection by the
28   public."). <u>The IQA, by contrast, does not create
     any legal right to information or its</u>

40

1          **correctness**.

2                **Because the statute upon which appellants rely
3                does not grant the rights that appellants claim
                 were invaded, appellants cannot establish an
4                injury in fact and, therefore, lack Article III
                 standing to pursue their case in the federal
5                courts.**

6     *Id.* at 159 (emphasis added)(footnotes omitted).

7          *Salt Institute's* reasoning is sound.  "The injury

8     required by Article III can exist solely by virtue of

9     'statutes creating legal rights, the invasion of which

10    creates standing.'"  *Edwards v. First Am. Corp.*, 610 F.3d

11    514, 517 (9th Cir. 2010)(quoting *Warth v. Seldin*, 422

12    U.S. 490, 500 (1975)).  The IQA creates no enforceable

13    legal rights at all, as the OMB and FWS Guidelines

14    contain no judicially manageable standards relevant to

15    Plaintiff's claims.  There is no standing.  Subject

16    matter jurisdiction over Plaintiff's IQA claims is absent

17    because no statutes or regulations create the rights FFA

18    claims were violated.

19

20    **B.   Merits of Third Claim for relief.**

21         FFA alleges that FWS violated the IQA when it

22    commissioned an outside peer review of the October 2008

23    draft Biological Opinion, because two members of that

24    peer review had either conducted research on the delta

25    smelt previously, or had mentorship connections with

26    scientists who had done so, or had allegedly accepted

27

28
                              41

grants from the agencies responsible for the Biological

Opinion, and were not sufficiently "independent" for

purposes of the IQA.  Doc. 54-1 at 21-25.  Because there

are multiple threshold jurisdictional bars to judicial

review of FFA's claims, it is unnecessary to discuss the

merits of the Third Claim for Relief in detail.

*Arguendo*, reviewing this claim on the merits, the

OMB's IQA Bulletin for Peer Review, which incorporates

the NAS Peer Review Policy, and which is in turn

incorporated by reference into FWS's IQA Guidelines,

specifically disclaims creating any rights enforceable

against the United States.  OMB IQA Bulletin for Peer

Review at Part XII, p. 41 (emphasis added).  The Third

Claim fails as a matter of law.

C.   <u>Certification of Partial Judgment.</u>

Rule 54(b) "permits a district court to enter

separate final judgment on any claim or counterclaim,

after making an express determination that there is no

just reason for delay.  This power is largely

discretionary, to be exercised in light of judicial

administrative interests as well as the equities

involved, and giving due weight to the historic federal

policy against piecemeal appeals."  *Reiter v. Cooper*, 507

U.S. 258, 265 (1993) (internal citations and quotations

omitted).  Rule 54(b) should be applied using a "pragmatic approach focusing on severability and efficient judicial administration."  *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987).  Certification under Rule 54(b) may be appropriate where the matters disposed of are "sufficiently severable factually and legally from the remaining matters," and could "completely extinguish [ ] ... liability."  *Id*.

     The Second and Third Claims, which raise procedural challenges under FWS's IQA Guidelines related to the timing of responses to an IQA Appeal and the makeup of the peer review panel that reviewed the BiOp, are legally distinct from the First Claim, which directly challenges the quality of the science applied in the BiOp itself and is being separately decided.  There is no reason to defer entry of judgment on these claims.

## V. <u>CONCLUSION</u>

     For the reasons stated above, Federal Defendants' motion for summary judgment on the Second and Third Claims is GRANTED; Plaintiff's cross-motion as to these claims is DENIED.  The First claim has been severed for decision with the Consolidated Delta Smelt cases.

     Pursuant to Federal Rule of Civil Procedure 54(b),

there is no just reason to delay entry of judgment as to the Second and Third Claims.  Partial final judgment will be entered for Defendants and against Plaintiffs as to the Second and Third Claims.

Federal Defendants shall submit a form of order consistent with this memorandum decision within five (5) days following electronic service of this decision.

SO ORDERED
Dated:  October 26, 2010

/s/ Oliver W. Wanger
Oliver W. Wanger
United States District Judge

44